RECEIVED
APR 2 4 2013
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| IN THE MATTER OF LARRY DOIRON, INC. AS OWNER AND OPERATOR OF THE BARGE POGO and THE M/V BILLY JOE | CIVIL ACTION NO. 11-1510<br><br>JUDGE DOHERTY<br><br>MAGISTRATE JUDGE HILL |

### MEMORANDUM RULING

Currently pending before the Court are: (1) a motion for summary judgment filed by Complainant-in-Limitation/Third-Party Plaintiff Larry Doiron, Inc. and Intervenor Robert Jackson (collectively referred to as "LDI") [Doc. 58]; and (2) a motion for summary judgment filed by Third-Party Defendants Specialty Rental Tools & Supply, L.L.C., Oil States Energy Services, L.L.C. and Zurich American Insurance Company (collectively referred to as "STS") [Doc. 63]. By way of their motion, LDI and Mr. Jackson seek a judgment "to enforce their contractual right to defense and indemnity," arguing "the Master Service Contract that is the subject of this motion obligates Specialty Rental Tools & Supply, LLP, and its successor, Oil States Energy Services, L.L.C., to defend, indemnify and hold harmless LDI and Jackson from and against the claims asserted by all claimants in the present litigation and to reimburse LDI and Jackson for all attorney's fees and costs incurred by LDI and Jackson to date." [Doc. 58, p.1] By way of its cross-motion, STS seeks a judgment dismissing the claims of LDI and Jackson, arguing "the Master Service Contract at issue must be construed under Louisiana law," and therefore "the indemnity provision contained therein is void and unenforceable under the Louisiana Oilfield Indemnity Act." [Doc. 63, p.1]

1

I. **Background**

On August 19, 2011, Larry Doiron, Inc. filed a complaint for "exoneration from or limitation of liability." [Doc. 1] On September 30, 2011, Peter Savoie filed a claim for injuries against LDI. [Doc. 6] Mr. Savoie asserts he was injured on February 25, 2011, while working on a fixed production platform owned by Apache Corporation and located on navigable waters in West Lake Verret in the Afachalaya Basin. [Doc. 6, pp. 10-11] Mr. Savoie was employed by STS as a Field Supervisor III. Apache hired STS to perform a "flow back" job[1] on its platform.

On February 24, 2011, STS sent two of its employees (Mr. Savoie and Mathew Delahoussaye) to perform flow back services on Apache's production platform. The flow back attempt on that day was unsuccessful. Mr. Savoie advised Brandon LePretre (Apache's Company Man) "that the flow back efforts on the well had been unsuccessful and they needed larger equipment, including a three inch flow back iron, a hydraulic choke manifold and a hydraulic gate valve to proceed with the flow back job." [Doc. 58-1, p.4] Mr. Savoie additionally advised Mr. LePretre that "a crane barge was needed to proceed with the flow back job."[2] [Id. at 4-5] Mr. LePetre testified Mr. Savoie advised him a crane barge was necessary, because the new equipment they were bringing out to perform the flow back services was too heavy for the workers to remove from the wellhead.[3] [Doc. 58-8, pp. 25-26, 32-33] Thereafter, Mr. LePretre contacted VAS Gauging, Inc. (an Apache contractor) and arranged for VAS to provide a crane barge to assist STS in the flow

---

[1] According to the parties, a "flow back" job is an operation designed to clean up a well and increase production.

[2] According to STS, "The only equipment that STS brought on location for the flow back services that [first] day was a dual choke, a manifold and some flow iron (pipe)." [Doc. 63-2, p.6]

[3] According to LDI, the hydraulic valve weighed approximately 500 pounds. [Doc. 58-1, p.2]

2

back job. VAS then contacted LDI and had LDI provide the crane barge POGO[4] for use at Apache's platform. The POGO was on location on the second day of the job. Mr. LePretre testified he was aware VAS intended to obtain a crane barge from LDI, and that the crane barge was at the worksite with the consent of Apache. [Doc. 58-8, pp. 31-32]

Despite the use of larger equipment on the second day, the flow back operations were still unsuccessful, and Mr. Savoie advised Mr. LePretre a coiled tubing unit would be necessary. The flow back job was then terminated, and Mr. Savoie and Mr. Delahoussaye began to disassemble and remove the flow back equipment. According to Mr. Savoie's testimony, after disconnecting some of the bolts that were holding the gate valve in place on the well head, he directed LDI's crane operator, Robert Jackson, to use the crane to place a "bind" on the gate valve so that he could remove the last bolt. Mr. Savoie had trouble removing the gate valve, but it eventually "popped out." [Doc. 69-2, p.139] When it finally popped out, "it canted even more, causing [the] chicksan to swing into the grease zerk where it was lodged." [Id.] Mr. Savoie then gave the crane operator the "all stop" signal. [Id. at 139; see also Doc. 69, p.7] Mr. Savoie then removed the chiksan from the grease zerk with his right hand and gave the crane operator the signal to boom down. [Doc. 69-2, p. 143] According to Mr. Savoie, rather than booming down, "All of a sudden the load come [sic] toward me very fast. When it did that, it knocked me off balance, I was going back, so I grabbed the chicksan [sic] to hold on. At that point, it's either, you know, fall backwards and break my neck or hold on for life." [Id. at 143-44] Mr. Savoie testified as he held the chiksan, the crane operator continued to boom up. "Then when I tell him to stop - - He wanted to put me down on the platform. I said, 'No, put me down on the barge.' So he started to come down. It just took him a long time

---

[4]The POGO is a self-propelled construction barge owned and operated by LDI. [Doc. 1, p.1]

3

to get me down. I couldn't hold on anymore. I slipped and was kind of grabbing for a grasp and I fell." [Id. at 144] Mr. Savoie asserts he fell approximately eight feet, onto the deck of the POGO, resulting in "a crush type injury to the right lower extremity."[5] [Doc. 6, pp. 11, 14]

On August 16, 2012, LDI made formal demand upon STS to defend, indemnify and hold LDI harmless against the claims asserted against LDI by Mr. Savoie. On September 24, 2012, STS rejected LDI's demand. LDI and STS have now filed the pending motions for summary judgment, thus necessitating this Court's interpretation of the nature of the Apache Master Service Contract, and potentially the scope of the defense and indemnity provision at issue therein.

All parties agree, at the time of Mr. Savoie's accident, STS was engaged by Apache to perform a flow back job at Apache's production platform, pursuant to a Master Service Contract, executed on October 12, 2005. [Docs. 58-2, ¶ 3; 63-7, ¶ 3] The MSC requires STS to defend and indemnify Apache, as well as Apache's contractors, subcontractors and invitees, from claims asserted by STS employees for bodily injury arising out of the work. Specifically, the contract provides as follows:

> Contractor hereby agrees to defend, release, indemnify, and hold harmless Company

---

[5]More specifically, plaintiff alleges the incident caused:

(1) an avulsion fracture of the distal lateral femoral condyle in the area of the fibular collateral ligament, (2) a comminuted fracture of the proximal diaphysis of the fibula, with displaced bony fragments, (3) crush type fractures of the medial and lateral tibial plateaus, with displaced bony fragments, and (4) severe edema of the right knee, along its anterior and posterior aspect, together with fluid within the supra patellar bursa sac; it was further determined that he also suffered injury to his lower back, with concomitant low back pain and left lower extremity pain.

[Doc. 6, p.14]

4

Group[6], from all losses, costs, expenses, and causes of action (including attorney's fees and court costs) for loss or for damage to property and for injuries to persons and death arising out of, incident to, or in connection with, the work or any and all operation under this contract and which are asserted by or arise in favor of contractor, its parent, subsidiary and affiliated companies, and their officers, directors, employees[,] in-house legal counsel, agents representatives [sic], invitees, co-lessees, co-owners, partners, joint venturers, contractors and subcontractors . . ., whether or not such losses, costs, expenses, injuries, death, or causes of action are caused or contributed to by the negligence, omission, strict liability, or conractual [sic] liability, or fault of any member of company group and whether or not caused by a pre-existing condition.

[Doc. 58-3, p.1 (capitalization omitted)]

## II. Analysis

By way of its motion, LDI argues the MSC is a maritime contract, because: the flow back job could not have been completed without the use of the POGO's crane, thus making the crane barge's role in the flow back operation an integral and necessary element of the operation; and, at the time of plaintiff's accident, the crew was utilizing the POGO's crane to lift the hydraulic valve and move it from Apache's platform to the equipment barge. Contrarily, STS argues the MSC is not a maritime contract, because: the MSC did not call for or require the use of a vessel[7]; the crane was required

---

[6] The MSA defines "Company Group" as follows: "As used herein, the term 'Company Group' shall mean each of Company, its parent, subsidiary and affiliated companies, and their officers, subcontractors (other than Contractor), and each of their respective successors, spouses, relatives, dependents, heirs and estates." [Doc. 58-3, p.1]

[7] Of note, STS does not explain how the equipment required to perform the flow back operations could have been utilized without the use of the crane barge POGO. Furthermore, the Fifth Circuit has found contracts which did not require the use of vessels for their execution to be maritime contracts, where a vessel ultimately became necessary in order to complete the work. *See e.g. Hoda v. Rowan Companies, Inc.*, 419 F.3d 379, 381 (5th Cir. 2005); *Devon Louisiana Corp. v. Petra Consultants, Inc.*, 247 Fed.Appx. 539, *5 (5th Cir. 2007). The Court additionally notes, "'Even a contract for offshore drilling services that does not mention any vessel is maritime if its execution requires the use of a vessel.'" *Hoda* at 383 (quoting *Demette v. Falcon Drilling Co., Inc.*, 280 F.3d 492, 500-501 (5th Cir. 2002)). While it is true the MSC makes no explicit reference to a vessel, it does contain a choice of law provision which provides: "This contract shall be construed and enforced in accordance with the general maritime law of the United States whenever any performance is contemplated in, on or above navigable

5

only for "rigging up" and "rigging down," and not for the actual flow back services[8]; the crane barge was not permitted to be on location during the actual flow back operations, and thus, the flow back operations were conducted without the use of a vessel[9]; plaintiff's alleged injuries occurred after the flow back operation was completed, during the rigging down process[10]; STS had "nothing to do" with the selection of LDI and had no obligation to charter a crane barge under the MSC[11]; plaintiff was not assigned to any vessel and never operated the crane; and finally, aside from rigging up and rigging down, all flow back operations were conducted either on the platform, or the adjacent equipment barge.

To determine whether a contract is a maritime or non-maritime contract, a court must first undertake an examination of the "historical treatment in the jurisprudence" of the type of work at issue - in this case, flow back services. Where, as here, the historical treatment is not sufficiently established, the Court should then engage in a "fact-specific inquiry" by applying the six factor test

---

waters, whether onshore or offshore. In the event that maritime law is held inapplicable, the law of the state in which the work is performed shall apply." [Doc. 58-3, p.2 (capitalization omitted)] Additionally, the contract requires STS to obtain certain types of marine insurance, "if contractor uses any vessels in connection with its work for company...." [Id. at p.4 (capitalization omitted)]

[8]More specifically, STS argues the crane "was needed for lifting a hydraulic gate valve onto the wellhead before flow back services began and for removing the valve once the flowback services were complete. Lifting equipment on and off a wellhead is referred to [sic] 'rigging up' and 'rigging down.' Mr. Delahoussaye testified that rigging up is not part of flow back services." [Doc. 63-2, p.6]

[9]The Court notes the testimony cited in support of this statement is that neither the tug nor the crane barge could be near the platform during flow back operations, because the crew was concerned about "ignition sources" in light of the fact they would be "flowing back gas." [Doc. 63-3, p. 36]

[10]STS concedes the POGO's crane was involved in plaintiff's accident, as the crew was in the process of rigging down at that time, but asserts this use of the crane "was only incidental to the principal work being performed – the flow back services." [Doc. 63-2, p.10]

[11]This is a distinction without a legal difference, as the MSC requires STS to defend and indemnify *Apache's* subcontractors and invitees - not STS's subcontractors and invitees.

set forth in *Davis and Sons, Inc. v. Gulf Oil Corp.*, 919 F.2d 313, 316 (5th Cir. 1990); *see also Hoda v. Rowan Companies, Inc.*, 419 F.3d 379, 381 (5th Cir. 2005). The six factors are:

> 1) what does the specific work order in effect at the time of injury provide? 2) what work did the crew assigned under the work order actually do? 3) was the crew assigned to work aboard a vessel in navigable waters? 4) to what extent did the work being done relate to the mission of that vessel? 5) what was the principal work of the injured worker? and 6) what work was the injured worker actually doing at the time of injury?

*Davis* at 316; *see also Hoda*, 419 F.3d at 381 (5th Cir. 2005).

### A. Historical Treatment

As stated above, the Court's first task is to investigate the historical treatment of the type of work at issue. Here, all parties agree Apache retained STS to perform flow back services on Apache's well located on a platform, in order to increase the well's productivity. Neither this Court, nor the parties, have found any jurisprudence addressing the historical treatment of flow back services, or whether contracts for such services, when performed on a platform in navigable waters but with the use of a crane located on a vessel, constitute maritime contracts. Accordingly, this factor is inconclusive. Nevertheless, it appears self-evident that flow back services have little to do with traditional maritime activity or commerce, but rather, are services peculiar to the oil and gas industry, whether those services are conducted on or offshore.

In *Devon Louisiana Corporation v. Petra Consultants, Inc.*, the Fifth Circuit undertook an examination of whether a contract to repair a fixed platform was a maritime contract. 247 Fed.Appx. 539 (5th Cir. 2007). Because the Court had not previously considered that question, it found the first prong of the *Davis* analysis (*i.e.* an examination of the "historical treatment") to be "inconclusive." *Id.* at 544; *see also Hoda* at 381 ("in some circumstances, though not here, the historical treatment

7

is clear enough to make the second part of the test 'unimportant.'"). In conducting its analysis, the *Devon* Court provided the following overview of the pertinent jurisprudence:

> We . . . held in *Domingue* . . . , that where a contract is only incidentally related to a vessel's mission, it is not maritime. *Domingue* involved a contract for wireline services on an offshore well. The work order required the crew to use a jack-up drilling rig. Although a jack-up rig has been classified as a vessel for maritime law purposes, **in *Domingue* the use of a vessel was purely incidental to the execution of the contract, and nothing about the contract required that the contractor use a vessel instead of a mere work platform.**
>
> In contrast, the work in *Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115, 1123 (5th Cir.1992), **required the use of a vessel as such.** *Campbell* involved casing work **that required the use of a vessel such as a jack-up rig, along with its derrick and draw works, because there was no fixed platform or derrick at the work site.** Similarly, in *Davis* we noted that the "particular nature of the terrain and production equipment required" the use of a vessel. *Davis* involved a work crew that traveled from one offshore job site to another and made various repairs to the offshore facilities and thus required a vessel "that could function as a mobile work platform."[12]
>
> In *Hoda*, . . . we addressed an analogous situation in which the crew's "exact work did not require the use of [a] vessel," **but the work "could not be performed without the [vessel's] direct involvement."** *Hoda* **involved the torquing up and down of the bolts on blowout preventer stacks, a task that by itself did not require the use of the vessel or its crew but that would have been irrelevant and impossible if the vessel's crew had not used the vessel's rig to set the stacks and bolts in place.**

*Devon* at 544-45 (citations and footnotes omitted)(emphasis added).

The *Devon* court ultimately determined the contract before it was a maritime contract, reasoning:

> **Although the "exact work" on the punch list did not require the use of a vessel** *per se*, the failure of the parties to obtain a hot work permit meant that the welding work, which was a prerequisite for completing some of the tasks on the punch list, **had to be completed on a vessel, not the fixed platform.** . . . The contract here

---

[12]*See also Davis* at 317 (mission of "mobile maintenance vessel" was "inextricably intertwined with maritime activities'").

8

required that the parties provide a vessel *per se*, because **only a vessel working alongside the already existing fixed platform could provide a suitable place to perform the hot work.** As was the case in *Davis*, *Campbell*, and *Hoda*, the instant contract required that a vessel be provided.

It is undisputed that the hot work could have been completed on the oil and gas platform if the appropriate permit had been obtained. The inability to perform the hot work on the vessel was not caused by any physical or technical limitations but by the legal limitations resulting from the absence of a permit. That is, however, a distinction without a legal difference. *Hoda*, *Davis*, and *Campbell* do not require that the need for a vessel be caused by physical or technical limitations. **There is no practical difference between having to use a vessel because of physical realities and having to use one because of legal restrictions. A vessel is required in both situations.**

**The jurisprudence therefore indicates that where the use of a vessel as such is required for completion of the contract, maritime law appropriately governs.**

*Id.* at 545 (emphasis added).

**B.** ***Davis* Factors**

As noted, after examining the historical treatment in the jurisprudence, the court is to apply the six factor test set forth in *Davis and Sons*.

### 1. What does the specific work order in effect at the time of injury provide?

According to counsel for STS, "STS was not performing under a specific work order on the day of Mr. Savoie's alleged injury."[13] [Doc. 63-2, p.10] However, all parties agree that Apache hired STS to perform flow back services on its well. As is commonplace in the oil and gas industry,

---

[13]The only support counsel for STS has provided for this statement is the deposition testimony of Mr. Delahoussaye, the STS employee working under Mr. Savoie on the day of the accident. Counsel has not shown Mr. Delahoussaye is the proper person to testify as to such matters, such that this Court can indeed conclude there were no specific work orders (written or verbal) for the flow back job on the day in question. Presumably there exists, at the very least, a verbal work order, or STS would have no reason to be on Apache's platform.

9

the MSC does not describe the work to be performed by the agreement, as it is simply a broadform blanket agreement which contemplates future specific work orders covering the specific work to be done.[14] *Domingue v. Ocean Drilling and Exploration Co.*, 923 F.2d 393, 394 (5th Cir. 1991).

### 2. What work did the crew assigned under the work order actually do?

All parties to this motion agree STS was performing flow back services on Apache's well *on a fixed platform*, in order to clean out the well and make it more productive. According to LDI, such work included: selecting the equipment necessary for the job, off loading the equipment from the barge, attaching a sling to the hydraulic valve, assembling the equipment on the well head, stabbing the hydraulic valve, turning on the pump and monitoring the fluids, serving as the signal man for the crane operator, disassembling the equipment and loading it back onto the barge, and conducting safety meetings (which included the crew of the crane barge). [Docs. 69, p.12; 69-2, pp.83, 85; 103]

### 3. Was the crew assigned to work aboard a vessel in navigable waters?

The STS crew was not assigned to work aboard a vessel in navigable waters. [Doc. 63-1, no. 34; LR 56.2] However, all parties appear to agree that STS employees performed some of their work from an equipment barge.[15]

---

[14]As stated in the MSC:

a) Company may, from time to time, request Contractor to perform work or render services hereunder ("Work") including but not limited to the following types of services: Chemicals, Equipment Rental.

b) Upon acceptance of a job order or other request to perform work . . . .

[Doc. 58-3, p.1, ¶ 2]

[15]According to STS, "the barge was used for deck space for the flow back equipment." [Doc. 63-2, p.4] STS implies the equipment barge was used merely as a work platform. [Doc. 71-1, p.4 ("[T]his

4.   **To what extent did the work being done relate to the mission of that vessel?**

According to STS, the flow back services did not relate to the mission of any vessel. According to LDI, "The POGO's mission was to provide the crane services needed by the STS crew to complete the flow back job." [Doc. 69, p.11] LDI further asserts Mr. Savoie was in charge of "when, where and how the STS crew used the crane in connection with the flow back job...." [Id.]

5.   **What was the principal work of the injured worker?**

Mr. Savoie's principal work was to provide flow back services to Apache's well.

6.   **What work was the injured worker actually doing at the time of injury?**

At the time of his injury, Mr. Savoie was in the process of disconnecting the hydraulic gate valve, so that it could be lifted and loaded onto the equipment barge and taken back to STS.

C.   **Finding as to nature of the contract**

While it is, decidedly, a close question, the Court concludes, after a review of the historical treatment, applicable jurisprudence, and evidence submitted, that the contract between Apache and STS is a maritime contract. The job for which STS was retained - flow back services - as a practical matter was proven to be one that could not have been completed without the use of a crane barge, as evidenced by the earlier unsuccessful attempts. As there was no crane on the platform with which to place the hydraulic valve onto the well head and remove it therefrom after completion of the work and as the vessel was ordered after unsuccessful attempts to perform the task, the vessel was

---

Court has held, and LDI states in its opposition, that a contract is not necessarily, not maritime when a vessel is being used only as a mere work platform."] According to LDI, "Throughout the process of preparing for the flow back job, the STS employees were regularly aboard the equipment barge and also used that barge for their safety meetings. Irrespective of the degree of their connection with the crane barge [POGO], their connection to the equipment barge was far more than an [sic] incidental." [Doc. 69, p.12]

11

necessary in order to perform the task at hand. As in *Hoda*, while STS's "exact work did not require the use of the vessel, her personnel or equipment," STS would have had nothing to do had LDI personnel not used the POGO's equipment to set the hydraulic gate valve in place. *Hoda* at 381 ("Greene's exact work did not require the use of the vessel, her personnel or equipment, but Greene's would have had nothing to do had Rowan personnel not used the rig's equipment to set the blow-out preventers in place, align them, place the bolts on them, and place the nuts on the bolts for tightening (or performed the same functions in reverse order."); *see also Devon* at *5 (although the work did not require a vessel *per se*, and could have been completed on the platform had the appropriate work permits been obtained, the failure to obtain a hot work permit meant the welding work had to be completed on a vessel, thus rendering the contract a maritime contract). Here, the work was attempted without the involvement of the vessel and was unsuccessful without the vessel. Accordingly, the Court finds, as did *Hoda*, STS's services were "inextricably intertwined" with the successful attempt at completion of the activity on the POGO, and all were dependent on LDI's placement of STS's equipment on which STS's employees worked, and could not be performed without the POGO's direct involvement. *Hoda* at 383 ("Greene's services were 'inextricably intertwined' with the activity on the rig, were dependent on Rowan's placement of the equipment on which Greene's employees worked, and could not be performed without the rig's direct involvement.")

Finally, to the extent STS argues LDI was neither an invitee nor a subcontractor of Apache, such that the indemnity provision would be inapplicable, STS has failed to carry its burden, both in

law and in fact.[16]

## III. Conclusion

In light of foregoing, the motion for summary judgment [Doc. 58] submitted by LDI and Robert Jackson is hereby GRANTED. Accordingly, STS must defend, indemnify and hold harmless LDI and Jackson from and against the claims asserted by Peter Savoie in the present litigation, and STS must reimburse LDI and Jackson for all attorney's fees and costs incurred by LDI and Jackson in connection therewith to date. The motion for summary judgment [Doc. 63] submitted by STS is DENIED.

THUS DONE AND SIGNED in Chambers, Lafayette, Louisiana, this 24 day of April, 2013.

_____
REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE

---

[16]The entirety of STS's argument on this issue is as follows:

> LDI was engaged to provide its services by VAS, not Apache. Therefore, there was no contractual privity between LDI and VAS. As such, LDI cannot be an invitee of Apache. Further, the corporate representative of LDI testified that LDI was acting as VAS' subcontractor, not Apache's. Therefore, STS would not owe LDI and Mr. Jackson defense and indemnity even if the general maritime law is held to apply to the MSC.

[Doc. 63-2, p.13] Clearly, LDI was the invitee of Apache, and LDI was at the worksite with Apache's consent. *See* Doc. 58-8, pp. 31-32; *Blanks v. Murco Drilling Corp.*, 766 F.2d 891, 894 (5th Cir. 1985). Accordingly, LDI falls within the protections of the indemnity provision of the MSC.